# IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
## AT NASHVILLE
### Assigned on Briefs November 12, 2014

## STATE OF TENNESSEE v. LORETO ESPINOSA, JR.

**Appeal from the Circuit Court for Bedford County**
**No. 17521    Franklin Lee Russell, Judge**

---

**No. M2013-02751-CCA-R3-CD - Filed April 29, 2015**

---

The Defendant, Loreto Espinosa, Jr., was convicted by a Bedford County Circuit Court jury of eighteen counts of aggravated rape of a child, Class A felonies. *See* T.C.A. § 39-13-531 (2014).  The trial court sentenced the Defendant as a Range III, persistent offender to sixty years for each conviction at 100% service and ordered partial consecutive sentences.  The court ordered Counts 1 and 18 to run consecutively to each other and Counts 2 through 17 to run concurrently to each other but consecutively to Counts 1 and 18, for an effective 180-year sentence.  On appeal, he contends that (1) the evidence is insufficient to support his convictions, (2) the State failed to make a proper election of the offenses for Counts 2 through 17, and (3) his sentence is excessive.  We conclude that insufficient evidence exists relative to Counts 1 through 17, and we reverse the judgments of the trial court, vacate the convictions, and dismiss the charges relative to those counts.  Although the trial court failed to require the State to make an election of the offense relative to Count 18, we conclude that the error was harmless beyond a reasonable doubt and affirm the judgment of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgments of the Circuit Court Affirmed in Part; Reversed in Part; Vacated in Part; Dismissed in Part; Case Remanded**

ROBERT H. MONTGOMERY, JR., J., delivered the opinion of the court, in which NORMA MCGEE OGLE and CAMILLE R. MCMULLEN, JJ., joined.

Donna Orr Hargrove, District Public Defender, and Michael J. Collins, Assistant Public Defender, for the appellant, Loreto Espinosa, Jr.

Robert E. Cooper, Jr., Attorney General and Reporter; Sophia S. Lee, Senior Counsel; Charles Frank Crawford, Jr., District Attorney General; and Michael Randles and Richard Cawley, Assistant District Attorneys General, for the appellee, State of Tennessee.

# OPINION

At the trial, the Defendant was convicted of eighteen counts of aggravated rape of a child. The victim was his stepdaughter, who was two-and-one-half years old at the time of the relevant incidents. The victim's mother testified that she and the Defendant were married at the time of the incidents but that they were currently in the process of getting divorced. The victim's mother testified that she had two children. K.G.,[1] the victim, was born on February 18, 2010. She and K.G. referred to the Defendant as Lo' and Papi.

The victim's mother testified that in May 2012, she worked at Sanford Pencil Company from 6:00 a.m. to 4:00 p.m. and that the Defendant worked for her uncle at Porter Roofing. K.G. went to daycare when she and the Defendant both worked. She said the Defendant did not work when it rained or was too hot. In June and July 2012, the Defendant did not work for several days because of the hot temperature. She said that on those days, K.G. either went to daycare or stayed with the Defendant. She said the Defendant also cared for K.G. when she had appointments and ran errands.

The victim's mother testified that on August 1, 2012, the Defendant began working at Tyson Foods, that the Defendant worked from mid-afternoon to late in the evening, and that the Defendant took K.G. to daycare that day. She left work at 4:00 p.m., and when she picked up K.G., she noticed that K.G. was not wearing pajamas and that no pajamas were at daycare. She said K.G. always wore pajamas to daycare. They went home and began their normal routine while the Defendant was at work. After giving K.G. a bath that night, she saw K.G. rubbing her vagina. She told K.G. not to do that and said they discussed why K.G. was rubbing that area. She noticed that K.G's pajamas were lying on K.G's bed and that her expensive moisturizing lotion was lying with K.G's pajamas. She said K.G. did not use that lotion.

The victim's mother testified that she called her sister, who suggested she call their preacher. As a result of her conversation with the preacher, she called the police and went to the police station for an interview. There, she told Detective Carol Jean that she was concerned the Defendant was molesting K.G. The detective also interviewed K.G. After they left the police station, they went home to gather a few belongings and stayed with a friend. She took K.G. to Our Kids, a child sexual assault center, the following morning for an examination.

The victim's mother testified that she had not spoken to the Defendant since August 1, 2012. She said the Defendant had written her letters, but she had not responded. The

---

[1] It is this court's policy to refer to minors and victims of sexual assault by their initials.

Defendant wrote her sister and brother-in-law a letter. She identified the letter, the Defendant's handwriting, and his signature. She read the following passage from the letter: "I never meant for any of this to happen and want you to know never have I messed with any other child. I hope they get me the help I need. No man should ever do anything to hurt a child."

The victim's mother testified that after she found her lotion in K.G's bedroom, she sent the Defendant a text message asking why her lotion was in K.G.'s bedroom. The Defendant responded that K.G. asked to use the lotion, which the victim's mother thought was unusual because K.G. had her own lotion and would have asked for it. She said K.G. had never asked to use her lotion.

The victim's mother testified that she worked on most Saturdays but that usually the Defendant did not. When the victim's mother worked on the weekends, K.G. stayed with the Defendant.

On cross-examination, the victim's mother testified that sometimes the Defendant took K.G. to daycare when the Defendant did not work. The Defendant had to have K.G. at daycare before 8:00 a.m. because breakfast was served then. She left for work at 5:30 a.m. and did not wake K.G. before she left. She said the Defendant worked Monday through Friday most weeks and occasionally on Saturdays. The Defendant left for work around 6:00 or 6:30 a.m. and arrived home usually between 2:00 and 5:00 p.m. She usually arrived home at 4:30 p.m. She said it took about thirty minutes to leave work, pick up K.G., and drive home. She did not recall how often the Defendant arrived home first. She said the Defendant sometimes picked up K.G. if he left work before she left work.

The victim's mother testified that she was provided receipts of K.G.'s daycare attendance. She said that between May and August 2012, she looked at her and the Defendant's work schedules and the weather to determine the dates on which the Defendant was alone with K.G. She was unsure if the Defendant sometimes took K.G. to daycare even though the Defendant did not work.

On redirect examination, the victim's mother testified that she knew the Defendant sometimes took K.G. to daycare even though he did not work. She said that on those days, she left for work at 5:30 a.m. and that K.G. had to be at daycare by 8:00 a.m. in order for K.G. to eat breakfast. The daycare was five minutes from their home. She agreed the Defendant had at least two hours alone with K.G. before K.G. had to be at daycare. She and the detective reviewed her and the Defendant's work schedules in order to determine the dates of the alleged incidents. On recross-examination, she stated that she did not know what occurred at home on those days.

Nurse Practitioner Sue Ross, an expert in child sexual assault examinations, testified that she performed K.G.'s child sexual assault medical examinations at Our Kids. K.G. was two and one-half years old at the time of her examination on August 2, 2012. The medical history obtained from the victim's mother showed no previous genital trauma, concerns about sexual abuse, urinary tract infections, chronic diarrhea, blood in the urine or stool, or recent history of painful or hard bowel movements, even though K.G. had taken Miralax for constipation during the previous year. Ms. Ross said the general physical examination showed nothing abnormal.

Ms. Ross testified that when she began the anogenital examination, K.G. became very anxious and repeated, "Please don't hurt me." She said the genital portion of the examination showed nothing remarkable, and she observed a normal genital area given K.G.'s age. Relative to the anal examination, she noted a "denuded area" of soft tissue around the anus. She said, though, that this was a typical finding after a child had a bowel movement. She confirmed that K.G. had a bowel movement just before the examination and concluded that the area was the result of a bowel movement. Ms. Ross observed an anal fissure, a superficial break or crack in the skin, at the six o'clock location of K.G.'s anus. She concluded that the fissure could have been the result of penetrating trauma, including a penis, and that the fissure could also have been the result of "a stooling phenomenon." She said that a hard, painful stool, diarrhea, or any other type of stooling phenomenon could have caused the fissure. She said such occurrences caused fissures in the "midline position." She said that penile penetration could have also caused the type of fissure found on K.G.'s anus.

Ms. Ross testified that the victim's mother suspected digital penetration and that the detective told her that the Defendant admitted to penile penetration of K.G.'s anus. She said she found nothing inconsistent with the Defendant's statement that he engaged in penile-anal penetration. She could not exclude sexual contact as the cause of the fissure to any degree of medical certainty.

Ms. Ross testified that the denuded area and the fissure were not severe enough to warrant medication. She said that the denuded area would probably have healed within twelve to twenty-four hours. She said that usually no obvious signs were visible during an examination for alleged penetration but that horrific injury would produce obvious signs of penetration. She said that 90% of the children examined under these circumstances had normal examinations or mild fissures.

On cross-examination, Ms. Ross testified that although the victim's mother did not report recent hard bowel movements or any associated problems, she could not exclude stooling phenomenon as the cause of the fissure.

K.G. testified that she was age three at the time of the trial. She could not identify Papi but said he had lived with her and her mother. She said Papi hurt her and pointed to her buttocks when asked where Papi hurt her. She said she told her mother that Papi hurt her. K.G. identified an anatomical drawing of a female and pointed to the buttocks, indicating where Papi hurt her.

On cross-examination, K.G. testified that she did not know how many times Papi hurt her. She remembered Papi's hurting her and denied someone told her to say that Papi hurt her.

Shelbyville Police Detective Carol Jean testified that on August 1, 2012, she interviewed separately the victim's mother and K.G. K.G. referred to the Defendant as Papi. She said that after speaking with them, she wanted to talk to the Defendant as soon as possible. The Defendant came to the police station after he left work.

Detective Jean testified that she read the Defendant his *Miranda* rights. The Defendant waived his rights and agreed to speak with Detective Jean and Detective Sam Jacobs. A recording of the interview was played for the jury. In the recording, the Defendant was confused about why he was at the police station and said he wanted to know what was happening. The Defendant said he had moved to Tennessee from Oklahoma in May 2012. The Defendant was told his wife was concerned about their daughter. He said, "Oh, my God." The Defendant had not talked to his wife because he had been at work. When he asked if he was going to be arrested, Detective Jean said that she did not know what would happen at the conclusion of the interview.

The Defendant stated that he and the victim's mother met in August 2011, dated for three months, decided to live together, married in February 2012, and moved to Tennessee in May 2012. He worked for his wife's uncle until the previous Sunday and began working at Tyson Foods on the day of the interview. He said that their marriage was "up and down" and that they argued. He denied any physical violence and said they argued because he was jealous. He said that K.G. called him Papi and that he was the only father K.G. had known. He said he took K.G. to daycare the previous three days. He said his wife cared for K.G. at night most of the time, but he gave K.G. baths and put her to bed "a lot." The Defendant said K.G. wore pull-up diapers but was potty trained. At this point in the interview, the Defendant said, "So, basically, my wife's thinking that I'm molesting my stepdaughter?" Detective Jean told the Defendant that K.G. was seen playing with herself, that K.G. reported that Papi "does it," and that K.G. said it hurt. The Defendant said he did not "have an explanation for that."

The Defendant stated that K.G. had a difficult time using the restroom and that he helped K.G. wipe afterward. He said they were in the bathroom or the bedroom when he wiped K.G. He said that if they were in the bedroom, K.G. was lying on the bed and he was standing beside the bed. When asked why K.G. would claim that the Defendant lay beside her on the bed, he could only think of nighttime when K.G. asked him to lie with her.

The Defendant stated that he did not understand the question when asked if he considered "playing with himself" while he wiped K.G. Detective Jacobs told the Defendant that K.G. stated that when the Defendant wiped her, he lay in bed with her and touched her "down there." The Defendant said, "Go ahead and arrest me. I can't, I can't lie to you guys, I'm sorry." The Defendant thought he was under arrest, but the detective told him that he was not. The Defendant responded, "No, because [of] what I'm about to tell you, I will be under arrest."

The Defendant stated that he had "been molesting his stepdaughter . . . for the last month or so." When asked what caused him to "do this," he said that he was sexually abused as a child by a female cousin and that he did not think he would "get caught." He also stated that his wife was not affectionate and was cold toward him. The Defendant denied attempting to penetrate K.G.'s vagina but said he penetrated her anus with his penis. He said he stopped when K.G. "started saying something." When asked how many times this happened, the Defendant said,

> Well, I really haven't been alone with [K.G.] – only because – let's see, I've worked the last two Saturdays. I mean, there was a week that I was completely – I – basically, I was working through Porter, it was, it rained four days straight. And every day, she went to daycare. But maybe fifteen times in the last month.

He said he last attempted but did not penetrate K.G.'s anus on August 1, at 7:00 a.m. while his wife was at work. He said he was not able to insert his penis because K.G. began screaming. He admitted, though, that he might have inserted the tip of his penis. The Defendant said he never fully penetrated K.G.'s anus but went "through the motions." He said K.G. screamed after a slight penetration, and he "backed off."

The Defendant denied any type of oral sex between him and K.G. but said K.G. had touched him previously. He denied having K.G. "rub" him and said K.G. sometimes grabbed him. He said he told her, "No." He explained that "either during or when [he] would change and go do something else, she would come up to [him] and . . . grab, . . . or after [he] was done, she'd come over there and say, What's that, and grab it and start playing with it." The Defendant said, "[I]t just felt weird[.]"

-6-

The Defendant stated that although he had rubbed K.G.'s vagina, he had not digitally penetrated her vagina. He said the rubbing stimulated him and caused an erection. He agreed "going between her legs" and inserting the tip of his penis in her anus caused an erection. He denied knowing why he "did this stuff." He asked about the possible charges and sentence. Detective Jean testified that the Defendant asked several times about the possible sentence and was worried about a lengthy sentence.

The Defendant said that before they moved to Tennessee, he worked daily and that other people were always around him and K.G. He said the incidents began only one month before the interview. The detectives told the Defendant that their primary concern was K.G. but that they wanted him to get the help he needed.

The Defendant was glad "something happened" and he was caught. He said he always acknowledged what he had done if he was in trouble. When he was told he was being charged with a felony and asked again when the sexual contact first began, the Defendant said it was before July 4, which indicated a period of time longer than one month. The Defendant said that when he first arrived in Tennessee, he did not have a job for about two or more weeks, that they had not found a daycare, and that his wife found work first. He said the incidents probably began in May after they moved to Tennessee. He denied any incidents occurred in Oklahoma. He said they moved to Tennessee on May 5, 6, or 7. The Defendant could not recall when his wife began working in Tennessee but said he began working on May 21. He thought the first incident occurred on May 25 and said it was not "[a] daily thing." He said he could not tell the detective the number of incidents but said it was probably more than fifteen because the incidents occurred for more than the one month he originally stated. When asked for his best "guess," he said about forty-five incidents.

Detective Jean testified that using the information provided by the Defendant and the Defendant's and the victim's mother's work histories, she was able to identify the dates on which the Defendant "would have had at least the opportunity to molest" K.G. Detective Jean stated that she and the victim's mother used the dates on which K.G.'s mother worked and the dates Porter Roofing reported the Defendant had not worked. Detective Jean said the Defendant identified May 25. She identified May 28 and 29 as dates when the Defendant did not work and K.G.'s mother worked. She agreed the Defendant and K.G. would have been alone together on those dates. She said the remaining dates in the indictment, except August 1, were verified as dates when K.G.'s mother worked and the Defendant did not. She agreed the Defendant identified August 1 as the date of the last incident. She agreed she did not ask K.G. to identify the dates of the incidents and said K.G. would not have known given her young age.

On cross-examination, Detective Jean testified that based on the Defendant's police statement, she could definitively identify May 25 as the date of the first incident and August 1 as the date of the last incident. When asked if the remaining dates were guesses, the detective stated,

> Well, not guesses. According to him, you know, he said it happened . . . approximately 45 times. And I spoke to the DA's office to see how we wanted to come up with times. And I spoke to his wife. We sat down with calendars and were told . . . the times that we knew that he had more of an opportunity by the work schedules.

When asked if she could say what occurred on the chosen dates, she said, "As close as possible." When asked if any of the dates surrounded a certain event, she noted that K.G.'s mother worked on Memorial Day and that the Defendant did not. She agreed the Defendant never said an incident occurred on Memorial Day. She denied that any of the dates, excluding the first and last incidents, centered around an event. She agreed the Defendant never admitted to "full penetration."

Upon this evidence, the Defendant was convicted of eighteen counts of aggravated rape of a child. The trial court sentenced the Defendant as a Range III, persistent offender to an effective 180 years' confinement. This appeal followed.

## I & II

### Sufficiency of the Evidence & Election of the Offenses

The Defendant contends that the evidence is insufficient to support his convictions because the proof only established that he was guilty of attempted aggravated rape of a child. In a related issue, he argues that the State failed to make a proper election of the offenses relative to Counts 2 through 17. The State contends that the evidence is sufficient and that the election sufficiently identified and distinguished the charged offenses.

In determining the sufficiency of the evidence, the standard of review is "whether, after viewing the evidence in the light most favorable to the prosecution, *any* rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt." *Jackson v. Virginia*, 443 U.S. 307, 319 (1979); *see State v. Vasques*, 221 S.W.3d 514, 521

(Tenn. 2007). The State is "afforded the strongest legitimate view of the evidence and all reasonable inferences" from that evidence. *Vasques*, 221 S.W.3d at 521. The appellate courts do not "reweigh or reevaluate the evidence," and questions regarding "the credibility of witnesses [and] the weight and value to be given to the evidence . . . are resolved by the trier of fact." *State v. Bland*, 958 S.W.2d 651, 659 (Tenn. 1997)*; see State v. Sheffield*, 676 S.W.2d 542, 547 (Tenn. 1984).

"A crime may be established by direct evidence, circumstantial evidence, or a combination of the two." *State v. Hall*, 976 S.W.2d 121, 140 (Tenn. 1998); *see State v. Sutton*, 166 S.W.3d 686, 691 (Tenn. 2005). "The standard of review 'is the same whether the conviction is based upon direct or circumstantial evidence.'" *State v. Dorantes*, 331 S.W.3d 370, 379 (Tenn. 2011) (quoting *State v. Hanson*, 279 S.W.3d 265, 275 (Tenn 2009)).

However, "a conviction cannot be based solely on a defendant's confession and, therefore, . . . the State must present some corroborating evidence to establish the corpus delicti[.]" *State v. Banks*, 271 S.W.3d 90, 140 (Tenn. 2008) (citing *State v. Smith*, 24 S.W.3d 274, 281 (Tenn. 2000)). "Corpus delicti is the body of the crime - evidence that a crime was committed at the place alleged in the indictment." *Van Zandt v. State*, 402 S.W.2d 130, 136 (Tenn. 1996). "A confession may sustain a conviction where there is other evidence sufficient to show the commission of the crime by someone." *Taylor v. State*, 479 S.W.2d 659, 661-62 (Tenn. Crim. App. 1972).

Recently, our supreme court clarified the corroboration requirement in *State v. Bishop*, 431 S.W.3d 22 (Tenn. 2014). Pursuant to the modified trustworthiness standard, "a defendant's extrajudicial confession is sufficient to support a conviction only if the State introduces 'independent proof of facts and circumstances which strengthen or bolster the confession and tend to generate a belief in its trustworthiness, plus independent proof of loss or injury.'" *Id*. at 58 (quoting *State v. Lucas*, 152 S.2d 50, 60 (N.J. 1959)). In other words, if the offense involves tangible injury, the prosecution "must provide substantial independent evidence tending to show that the defendant's statement is trustworthy, plus independent prima facie evidence that the injury actually occurred." *Id*. at 59. If, however, the offense does not involve a tangible injury, the prosecution "must provide substantial independent evidence tending to show that the defendant's statement is trustworthy, and the evidence must link the defendant to the crime." *Id*. The court noted that offenses that do not involve a tangible injury "may include inchoate crimes, certain financial crimes, status crimes, and sex offenses lacking physical evidence and a victim who can testify." *Id*. at n.28. The substantial independent evidence "must corroborate essential facts contained in the defendant's statement," regardless of whether a tangible injury occurred, and evidence

corroborating "collateral circumstances surrounding the confession will not suffice to establish trustworthiness." *Id.* at 59-60.

Aggravated rape of a child is defined as "the unlawful sexual penetration of a victim by the defendant or the defendant by a victim, if the victim is three (3) years of age or less." T.C.A. § 39-13-531(a). Sexual penetration is defined as "sexual intercourse, cunnilingus, fellatio, anal intercourse, or any other intrusion, *however slight*, of any part of a person's body . . . into the genital or anal openings of the victim's, the defendant's, or any other person's body, but emission of semen is not required[.]" *Id*. § 39-13-501(7) (2014) (emphasis added).

When evidence is presented of multiple offenses that would fit the allegations of the charge, the State must elect the particular offense for which a conviction is sought, and the trial court must instruct the jury as to the need for jury unanimity regarding the finding of the particular offense elected. *See, e.g., State v. Brown*, 762 S.W.2d 135, 137 (Tenn. 1988); *State v. Walton*, 958 S.W.2d 724, 727 (Tenn. 1997). "The purpose of election is to ensure that each juror is considering the same occurrence. If the prosecution cannot identify an event for which to ask a conviction, then the court cannot be assured of a unanimous decision." *State v. Shelton*, 851 S.W.2d 134, 138 (Tenn. 1993).

> This election requirement . . . ensures that a defendant is able to prepare for and make a defense for a specific charge. Second, election protects a defendant against double jeopardy by prohibiting retrial on the same specific charge. Third, it enables the trial court and the appellate courts to review the legal sufficiency of the evidence. The most important reason for the election requirement, however, is that it ensures that the jurors deliberate over and render a verdict on the same offense.

*State v. Adams*, 24 S.W.3d 289, 294 (Tenn. 2000). The critical reason, however, for the election is to protect a defendant against "patchwork verdicts." *Shelton*, 851 S.W.2d at 137.

> [T]he election requirement has been applied almost exclusively in the sex crimes context, and specifically, when the defendant is alleged to have committed a series of sexual acts over a lengthy period of time against young children who are unable to identify the exact date on which any one act was perpetrated.

*State v. Johnson*, 53 S.W.3d 628, 631 (Tenn. 2001) (citing *State v. Brown*, 992 S.W.2d 389 (Tenn. 1999)). "[T]he State may introduce evidence of sex crimes allegedly committed against the victim during the time frame charged in the indictment, but, at the close of the

proof, the State must elect the facts upon which it is relying for conviction." *Id.* (citation omitted). "If a jury is allowed to convict without specific evidence supporting the election, then the election is superficial and meaningless." *State v. Johnny Lee Hines*, No. 01C01-9709-CC-00405, 1999 WL 33107, at *4 (Tenn. Crim. App. Jan. 27, 1999). "The offense must be proven in accordance with the election, i.e., to have occurred on [the elected] date and under [the] circumstances." *State v. Marvin D. Nance*, No. E2005-01623-CCA-R3-CD, 2007 WL 551317, at *6 (Tenn. Crim. App. Feb. 23, 2007) (citing *Johnny Lee Hines*, 1999 WL 33107, at *6), *perm. app. denied* (Tenn. May 14, 2007). Relative to an election of offense,

> [T]he standard for sufficiency of the evidence applies to the designation of offenses as though it were an element of the offenses. Not only must the state's election identify and distinguish offenses sufficiently to allow the trier of fact to render discrete and unanimous verdicts on each, the state must . . . support this election with evidence sufficient for a reasonable trier of fact to find that the offenses occurred as elected beyond a reasonable doubt.

*Johnny Lee Hines*, 1999 WL 33107, at *4.

The record reflects that Count 1 of the indictment reads as follows:

COUNT 1: LORETO ESPINOSA, JR. on or about the 25th DAY OF MAY, 2012, in BEDFORD County, Tennessee, and before the finding of this indictment, did intentionally, knowingly or recklessly engage in unlawful sexual penetration of [K.G.] by LORETO ESPINOSA, JR. and [K.G.] is three (3) years of age or less, in violation of Tennessee Code Annotated § 39-13-531, and against the peace and dignity of the State of Tennessee.

The remaining counts in the indictment are identical, except for the relevant dates on which the offenses were alleged to have occurred. Count 2 alleged the offense occurred on or about May 28, 2012, Count 3 alleged on or about May 29, 2012, Count 4 alleged on or about June 4, 2012, Count 5 alleged on or about June 11, 2012, Count 6 alleged on or about June 16, 2012, Count 7 alleged on or about June 28, 2012, Count 8 alleged on or about June 29, 2012, Count 9 alleged on or about June 30, 2012, Count 10 alleged on or about July 10, 2012, Count 11 alleged on or about July 11, 2012, Count 12 alleged on or about July 12, 2012, Count 13 alleged on or about July 13, 2012, Count 14 alleged on or about July 17, 2014, Count 15 alleged on or about July 26, 2012, Count 16 alleged on or about July 30, 2012,

Count 17 alleged on or about July 31, 2012, and Count 18 alleged on or about August 1, 2012.

Upon this court's own motion, the record was supplemented with a transcript of the trial court's jury instructions regarding the election of the offenses. The record reflects, in relevant part, that the court instructed the jury relative to Count 1 that

> the State has elected to submit for your consideration the alleged act of anal penetration of [K.G.] by Loreto Espinosa, Junior, on or about May the 25th, 2012, in which the defendant allegedly penetrated the victim with his penis. The state relies for evidence of the date of the incidents on the defendant's own recorded interview with Detectives Jean and Jacobs . . . in which the defendant allegedly specified that an aggravated rape of a child occurred on that day.

Relative to Counts 2 through 17, the trial court instructed that

> the state has elected to submit for your consideration the alleged acts of anal penetration of [K.G.] by Loreto Espinosa, Jr., in which the defendant allegedly penetrated the victim with his penis. The dates of the alleged anal penetrations are as follows: Count 2, on or about May the 28th, 2012; Count 3, on or about May 29th, 2012; Count 4, on or about June 4th, 2012; Count 5, on or about June 11th, 2012; Count 6, on or about June 16th, 2012; Count 7, on or about June 28th, 2012; Count 8, on or about June 29th, 2012; Count 9, on or about June 30th, 2012; Count 10, on or about July the 10th, 2012; Count 11, on or about July 11th, 2012; Count 12, on or about July 12, 2012; Count 13 on or about July 13, 2012; Count 14 on or about July 17, 2012; Count 15 on or about July 16, 2012; . . . Count 16, on or about July 30th, 2012; [and] Count 17, on or about July the 31st, 2012.
>
> In support of these particular dates . . . in Counts 2-17, the State relies upon the circumstantial evidence that the defendant was not working . . . on that particular date, upon the circumstantial evidence that [the victim's mother] was working on that particular date, and upon the defendant's own estimate of the number of offenses he committed during the relevant time period after May 25th, 2012, and before August 1st, 2012.
>
> The alleged evidence of the defendant's alleged rapes is a statement given by the defendant in his interview with Detectives Jean and Jacobs on

August 1st, 2012, and continuing into August 2nd, 2012, which estimates . . . that there were 15 to 45 such incidents.

Members of the jury, you are to consider the evidence elected by the State upon which the State has indicated they rely for any given count of aggravated rape of a child or the lesser included offenses under that particular count.

The trial court did not provide the jury with an election of the offense relative to Count 18.

The Defendant argues that the evidence relative to all eighteen counts is insufficient because the proof only established that he attempted but never penetrated K.G.'s anus with his penis. We disagree. The evidence reflects that the victim was less than three years old at the time of the incidents. K.G. testified that the Defendant, who she referred to as Papi, hurt her in her buttocks. Although the Defendant first stated when describing the incidents that he only attempted to penetrate K.G.'s anus, he later stated that he inserted the tip of his penis in her anus but not fully. Likewise, he admitted that inserting the tip of his penis in K.G.'s anus resulted in sexual arousal, that K.G. screamed after slight penetration, and that he stopped whenever she screamed or "started saying something." The jury assessed the credibility of the Defendant's statement and the victim's testimony, and the verdicts reflect it found that the Defendant inserted his penis, however slight, in the victim's anus. Further, Ms. Ross observed an anal fissure during the victim's examination and could not exclude penile penetration as the cause.

Although we conclude that sufficient evidence exists showing the Defendant penetrated the victim's anus with his penis, we will address the sufficiency of the evidence relative to each count in the indictment. Because the State presented the most evidence relative to Count 18, we address it first. We address Count 1 individually and address Counts 2 through 17 collectively.

Relative to Count 18, the Defendant told the police that the anal penetration occurred on August 1. The record reflects that between May and August 2012, the victim's mother worked the morning shift from 6:00 a.m. to 4:00 p.m. and that she left for work around 5:30 a.m. K.G. and the Defendant remained at home until the Defendant took K.G. to daycare on the days he worked. On the days the Defendant did not work, K.G. either went to daycare or stayed home with the Defendant. Additionally, Ms. Ross's examination of K.G. on August 2 revealed a midline anal fissure. Ms. Ross could not exclude to any degree of medical certainty the possibility that the fissure was caused by penile penetration. On August 1, the victim's mother noticed that K.G. was not wearing her pajamas when she picked up K.G. from daycare and that K.G. always wore her pajamas to daycare. K.G.'s pajamas were

-13-

lying on K.G.'s bed near the victim's mother's expensive lotion, which K.G. did not use. K.G. testified that the Defendant hurt her, pointed to her buttocks when asked where the Defendant hurt her, and identified the same area on an anatomical drawing. The evidence sufficiently corroborates the Defendant's statement that he penetrated K.G.'s anus with his penis on August 1. The evidence is sufficient relative to Count 18.

Relative to Count 1, the Defendant stated that the anal penetration occurred on May 25, but we conclude that the State failed to present sufficient corroborating evidence to establish the corpus delicti. The evidence reflects that the victim could only testify that the Defendant hurt her in her buttocks. The victim shook her head negatively when asked if she knew how many times the Defendant hurt her. The State failed to elicit from her whether the Defendant hurt her once, twice, or on multiple occasions. Further, the State failed to question Ms. Ross about the possible time frame in which the victim might have been subjected to any penile penetration. The evidence reflects that the Defendant penetrated the victim on August 1, one day before Ms. Ross's examination, and that Ms. Ross could not exclude penile penetration as the cause of the fissure, which she said had not yet healed. The only evidence presented at the trial that the Defendant penetrated the victim on May 25 was the Defendant's statement to the police. The trial court's instruction to the jury relative to Count 1 shows that the only evidence relied upon by the State was the Defendant's statement to the police, and a conviction cannot be based solely on his confession. *See Bishop*, 431 S.W.3d at 58; *Banks*, 271 S.W.3d at 140.

This court is not insensitive to the challenges of presenting a witness as young as the victim in this case. However, the State must present evidence independent of the Defendant's confession to show that he penetrated the victim on May 25, and the record fails to show that the State presented sufficient evidence in this regard. As a result, we reverse the judgment of the trial court, vacate the conviction in Count 1, and dismiss the charge.

Relative to Counts 2 through 17, the record reflects that although the Defendant generally admitted to anally penetrating K.G. with his penis fifteen to forty-five times between May and August 2012, he provided dates only for Counts 1 and 18. His description of the incidents, however, was general in that he slightly inserted the tip of his penis in K.G.'s anus. No additional detail was provided by the Defendant. Although we note the victim's young age, the State did not question her about any specific events, dates, locations, or conduct by the Defendant relative to the incidents. Although the State's theory was the incidents must have occurred on dates when the victim's mother worked and when the Defendant did not work and was home with K.G., no evidence was presented that any prohibited conduct occurred on or around the dates listed in Counts 2 through 17.

-14-

Detective Jean testified that none of the dates in Counts 2 through 17 centered around any particular event and that the dates were times when the Defendant had an opportunity to engage in prohibited conduct. Detective Jean and the victim's mother each conceded that they did not know what occurred, if anything, on those chosen dates. The victim's mother also conceded that the victim might have attended daycare on days the Defendant did not work. Likewise, even on dates when the Defendant and the victim's mother both worked, the Defendant and K.G. were alone for at least two hours in the morning. The Defendant was unable to recall specific dates but said his conduct was not "[a] daily thing." The detectives did not elicit from the Defendant information to determine when any prohibited conduct occurred except the first and last dates. As a result, no evidence was presented corroborating the Defendant's statement relative to these counts. *See Bishop*, 431 S.W.3d at 58; *Banks*, 271 S.W.3d at 140. The evidence is insufficient to support a finding that the Defendant engaged in the unlawful sexual penetration of K.G. relative to Counts 2 through 17, and those convictions must be vacated and the charges dismissed.

Although we have concluded that the evidence is insufficient to support the convictions in Counts 1 through 17 and that these convictions must be vacated and the charges dismissed, we will address the Defendant's contention that the State failed to make a proper election of the offenses relative to Counts 2 through 17. Although not raised by the Defendant, we note the similarity between the election in Counts 2 through 17 with the State's election in Count 1. The Defendant relies on *State v. Brown*, 373 S.W.3d 565 (Tenn. Crim. App. 2011), to support his argument that the election insufficiently detailed and distinguished these incidents.

In *Brown*, the defendant was indicted for eighty-five counts of rape of a child. The only distinguishing feature between each count in the indictment was the time the offense occurred. The indictment listed one count for every month between 1995 and 2001 and one count in 2002. The evidence presented at the trial showed that the victim stayed overnight with her grandmother and the defendant twice per month during the 1995 to 2002 time frame in the indictment. The victim testified that the defendant "always 'did the same thing,'" which included the Defendant's putting lotion on his hands, placing his fingers inside her vagina, and putting his mouth "down there." *Id.* at 568. Although the State argued on appeal that the victim "recounted a single set of facts constituting the crime and testified that the same facts happened every time she visited the [appellant]," this court concluded that the victim "could not provide a single detail that differentiated one offense from another" and that failure to make an election of the offense was reversible error. *Id.* at 575.

Although the Tennessee Supreme Court has granted the State's application for permission to appeal in *State v. Jimmy Dale Qualls*, No. W2013-01440-CCA-R3-CD, 2014 WL 4072098 (Tenn. Crim. App. Aug. 18, 2014), *perm. app. granted* (Tenn. Jan. 15, 2015), we nonetheless find the Court of Criminal Appeals opinion instructive. We note that Counts

1 through 17 in the present case are being dismissed because of insufficient evidence, not an insufficient election of the offenses. We consider *Jimmy Dale Qualls* instructive relative to the sufficiency of the State's election, which is not dispositive to those counts in the indictment.

In *Jimmy Dale Qualls*, the defendant was convicted of thirty-seven counts of sexual battery by an authority figure. The two victims testified generally that the defendant touched their vaginal areas and buttocks during the specified times in each count of the indictment. The victims provided no additional information regarding each alleged incident. This court concluded that the evidence failed to provide particularity that would have permitted a jury to render discrete verdicts for each count. *Jimmy Dale Qualls*, 2014 WL 4072098, at *10. The court also concluded that "[t]he fact that the testimony was general does not relieve the State of the obligation to make a proper election." *Id.*; *see State v. Clyde Hambrick, Jr.*, No. E1999-00893-CCA-R3-CD, slip op. at 10-12 (Tenn. Crim. App. June 17, 2000) (concluding that an election of the offenses as the first event of every month was inadequate where the victim failed to described multiple incidents of sexual misconduct with particularity). This court remanded the case for a new trial and instructed the State to elicit sufficient facts from the victims to distinguish between each of the alleged offenses and to make an election of the offenses based on those facts, which would permit a jury to render discrete verdicts for each count in the indictment. *Id*.

In the present case, the State elected in Counts 2 through 17 that the Defendant penetrated K.G.'s anus with his penis and that this conduct occurred on the respective dates contained in each count. However, we conclude that the election provided no factual basis "to differentiate among the various counts of the same offense." *Tidwell v. State*, 922 S.W.2d 947, 501 (Tenn. 1991). Likewise, the jury was not presented any "means . . . to match a specific conduct to a specific count." *Id*. Our supreme court has called this "a grab-bag theory of justice" in which the State could "present proof on as many offenses within the alleged period as it chose." *Id*. Under this method, "each offense will have been proven beyond a reasonable doubt" and the jury "may reach into the brimming bag of offenses and pull out one for each count." *Id*. Although the State in the present case presented the Defendant's statement relative to the estimated number of incidents and was permitted to introduce evidence of dates when it was possible sexual misconduct occurred, the State was required to "elect . . . facts upon which it [was] relying for [each] conviction." *Johnson*, 53 S.W.3d at 631. Evidence of generalized conduct without particularity to distinguish the incidents will not suffice. The State's election of the offenses was insufficient and failed to prevent the possibility of a patchwork verdict.

Although not raised by the parties, the record reveals relative to Count 18 that the jury was not provided an election of the offense and that the parties did not discuss an election.

As a result, no explanation exists in the record regarding the State's failure to provide a proper election. We note that "when evidence suggests that a defendant has committed many sexual crimes against a victim, the [trial] court must require the state to elect the particular offenses for which convictions are sought." *Shelton*, 851 S.W.2d at 137. Our supreme court has stated that in cases such as this, the failure of the trial court to require the State to make an election of the offense requires the appellate courts to remand for a new trial. *See Brown*, 992 S.W.2d at 392; *Walton*, 958 S.W.2d at 727-28; *Burlison v. State*, 501 S.W.2d 801 (Tenn. 1973); *State v. Clabo*, 905 S.W.2d 197, 205 (Tenn. Crim. App. 1995). However, "the failure to elect or give an [election of the offense] instruction should not constitute reversible constitutional trial error if it can be concluded beyond a reasonable doubt that the verdict was unanimous[.]" *State v. Frank Frierson*, No. 01C01-9112-CC-00357, 1993 WL 273974, at *25 (Tenn. Crim. App. July 22, 1993), *perm. app. denied* (Tenn. Oct. 2, 1995).

The evidence reflects relative to Count 18 that the Defendant told the police that the anal penetration occurred on August 1. Ms. Ross's examination of K.G. on August 2 revealed an unhealed midline anal fissure, and Ms. Ross could not exclude to any degree of medical certainty the possibility that the fissure was caused by penile penetration. On August 1, the victim's mother noticed that K.G. was not wearing her pajamas when she picked up K.G. from daycare and testified that K.G. always wore her pajamas to daycare. K.G.'s pajamas were lying on K.G.'s bed near the victim's mother's expensive lotion, which K.G. did not use. The victim's mother noticed K.G. rubbing her private area that evening, told K.G. not to do that, and they discussed why K.G. rubbed that area. After speaking with K.G., the victim's mother took K.G. to Our Kids for a medical examination on August 2. K.G. testified that the Defendant hurt her and that she told her mother that the Defendant hurt her. K.G. pointed to her buttocks when asked where the Defendant hurt her, and she identified the same area on an anatomical drawing.

Although we have concerns about the State's failure to make an election of the offense relative to Count 18, we must conclude that the failure does not rise to the level of reversible constitutional error. The evidence shows that the Defendant penetrated the victim's anus on August 1 and that only one incident was alleged to have occurred on that date. It would constitute speculation for this court to conclude that the jury was not unanimous in determining the Defendant penetrated the victim's anus with his penis on August 1. *See Frank Frierson*, 1993 WL 273974, at *26. Despite our affirming the Defendant's conviction, we caution the State and the trial court that the failure to make a proper election of the offense and to provide a proper jury instruction for *each* count in an indictment might result in reversible error. However, the strength of the evidence presented at the trial relative to Count 18 forecloses the possibility that the jury rendered a patchwork verdict. *See Shelton*, 851 S.W.2d at 137.

# III

## Sentencing

Although we have concluded that Counts 1 through 17 must be dismissed, we will consider the Defendant's contention that his effective 180-year sentence is excessive and unreasonable. He argues that the sentence does not "fit the crime or the offender" and that the trial court abused its discretion. The State responds that the trial court did not abuse its discretion. We agree with the State.

This court reviews challenges to the length of a sentence within the appropriate sentence range "under an abuse of discretion standard with a 'presumption of reasonableness.'" *State v. Bise*, 380 S.W.3d 682, 708 (Tenn. 2012). A trial court must consider any evidence received at the trial and sentencing hearing, the presentence report, the principles of sentencing, counsel's arguments as to sentencing alternatives, the nature and characteristics of the criminal conduct, any mitigating or statutory enhancement factors, statistical information provided by the Administrative Office of the Courts as to sentencing practices for similar offenses in Tennessee, any statement that the defendant made on his own behalf, and the potential for rehabilitation or treatment. *State v. Ashby*, 823 S.W.2d 166, 168 (Tenn. 1991) (citing T.C.A. §§ 40-35-103 (2014), -210 (2014); *State v. Moss*, 727 S.W.2d 229, 236 (Tenn. 1986); *State v. Taylor*, 744 S.W.2d 919 (Tenn. Crim. App. 1987)); *see* T.C.A. § 40-35-102 (2014).

Likewise, a trial court's application of enhancement and mitigating factors is reviewed for an abuse of discretion with "a presumption of reasonableness to within-range sentencing decisions that reflect a proper application of the purposes and principles of our Sentencing Act." *Bise*, 380 S.W.3d at 706-07. "[A] trial court's misapplication of an enhancement or mitigating factor does not invalidate the sentence imposed unless the trial court wholly departed from the 1989 Act, as amended in 2005." *Id.* at 706. "So long as there are other reasons consistent with the purposes and principles of sentencing, as provided by statute, a sentence imposed . . . within the appropriate range" will be upheld on appeal. *Id.*

The abuse of discretion with a presumption of reasonableness also applies to the imposition of consecutive sentences. *State v. Pollard*, 432 S.W.3d 851, 859 (Tenn. 2013). A trial court has broad discretion in determining whether to impose consecutive service. *Id.* A trial court may impose consecutive sentencing if it finds by a preponderance of the evidence that one of the criterion is satisfied in Tennessee Code Annotated section 40-35-115(b)(1)-(7) (2014). In determining whether to impose consecutive sentences, though, a trial court must ensure that "a sentence [is] justly deserved in relation to the seriousness of

the offense," is "no greater than that deserved for the offense committed," and is "the least severe measure necessary to achieve the purposes for which the sentence is imposed." T.C.A. § 40-35-102(1), -103(2), (4); *see State v. Desirey*, 909 S.W.2d 20, 33 (Tenn. Crim. App. 1995).

At the sentencing hearing, the presentence report was received as an exhibit. The report shows previous felony convictions in Oklahoma for drug possession and unlawful drug paraphernalia uses and activities. In Texas, the Defendant was previously convicted of violating the driver's license law, first degree burglary, and misdemeanor marijuana possession. Relative to the Oklahoma felony drug possession conviction, the report shows that the Defendant pleaded guilty in April 2009 and received a five-year sentence to be served on probation. The first offense, according to the Defendant's statement, occurred on May 25, 2012.

During the presentence interview, the Defendant admitted that when he was age thirteen, he sexually molested his two sisters. Upon further investigation, the officer who prepared the presentence report learned that as a juvenile, the Defendant was placed on probation for indecency with a child less than seventeen years old. A May 1995 Clay County, Texas Juvenile Court adjudication order received as an exhibit shows that the Defendant was found delinquent for intentionally and knowingly engaging in sexual contact by touching the genitals of an unnamed female with his penis with the intent to arouse and gratify his sexual desire. The victim was less than seventeen years old, and the Defendant was age thirteen.

The presentence report shows that the Defendant dropped out of high school but later obtained a high school equivalency certificate. The Defendant reported a medical history of seizures and said he felt he needed treatment for depression. The Defendant admitted he used methamphetamine between ages twenty-one and thirty, marijuana between ages sixteen and twenty-nine, and cocaine for a short period of time at age twenty-five. He also admitted he abused pain medication for one year. He reported first drinking alcohol at age twelve and said he became a social drinker. He claimed that he gave up drugs when he met the victim's mother in order to have "normal family life." The report shows that the Defendant had a daughter from a previous relationship. The Defendant reported previous Tennessee employment at Tyson Foods from July 30, 2012, to August 1, 2012, and at Porter Roofing from May 22, 2012, to July 29, 2012. Porter Roofing reported that the Defendant's employment was terminated.

A June 21, 2013 handwritten letter from the Defendant to the victim's mother was received as an exhibit. In the letter, the Defendant stated as follows:

You at last have what you wanted to never see me again. Perhaps in court on the 27th of June may be the last time you see me. Please when you get to the point that you are not mad or angry with me, you will find it in your heart to send me pictures of my daughter who I will never get to hold. Although you might not know this for I know you are living with Emily and her family. [K.G.] told me this in court. As for your coaching her, makes no matter to me anymore. You can teach a child anything.

I hope you find . . . happiness, and that you don't deny my/our daughter, yes our daughter to know her father one day. Please if you would send me or my mother my pictures and my Oklahoma drivers license. My Bible I would like back you can understand this I am sure. I was very [curious] about what happened to your face[.] I still care for Both you and the girls, you might not understand. Think about all you said in court, I never found out, that I didn't work until after 6am sometimes later and you took [K.G.] to . . . [daycare] Before going to work. I can still remember your face the day we got married.

The Defendant stated that their daughter would someday want to know why her last name was changed and that he hoped she would tell their daughter the truth. He stated that K.G. was at daycare "more than not and on the weekend Amy kept" K.G. Regarding the biological daughter the Defendant shared with the victim's mother, he expressed his desire to hold her once before going to prison and stated that the correction officer would permit a meeting if the victim's mother consented. He told her to "check your Divorce papers not everything is right, just saying."

The Defendant testified that his work schedule showed that he worked on May 25, 2012, and that his wife took K.G. to daycare that morning. He complained about trial counsel's representation, and the trial court clarified for the Defendant that post-conviction proceedings were appropriate for ineffective assistance of counsel claims. The Defendant added nothing to his testimony.

The trial court sentenced the Defendant as a Range III, persistent offender. *See* T.C.A. § 39-13-531(b) ("Aggravated rape of a child is a Class A felony and shall be sentenced within Range III[.]"); *Id.* § 40-35-501(h)(2)(i)(2)(L) (2010) (stating a conviction for aggravated child rape requires 100% service of the sentence imposed less sentencing credits up to 15%). Relative to enhancement factors, the court found that factor (1) applied based on the Defendant's previous felony convictions for drug possession, first degree burglary, possession of drug paraphernalia, and simple possession. *See id.* § 40-35-114(1) (2014) ("The defendant has a previous history of criminal convictions or criminal behavior,

in addition to those necessary to establish the appropriate range[.]"). The court also found that factor (5) applied because the Defendant treated the victim with unique cruelty when he claimed he only withdrew his penis from K.G.'s anus when she "scream[ed] . . . in pain." *See id.* § 40-35-114(5) ("The defendant treated . . . [the] victim . . . with exceptional cruelty[.]"). The court found that factor (13) applied because the Defendant was serving a five-year sentence on probation at the time the offenses were committed. *See id.* § 40-35-114(13)(C) ("At the time the felony was committed . . . the defendant [was] [r]eleased on probation[.]"). The court also found that factor (14) applied because the Defendant violated a position of private trust because he was the victim's stepfather. *See id.* § 40-35-114(14) ("The defendant abused a position of . . . private trust . . . that significantly facilitated the commission or the fulfillment of the offense[.]"). The court stated that the Defendant acted in a parental role and that the victim's mother trusted him with K.G. and to deliver K.G. to daycare safely. The court found that factor (16) applied because the Defendant had a juvenile adjudication that would have been a felony conviction if he were convicted of that offense in criminal court. *See id.* § 40-35-114(16) ("The defendant was adjudicated to have committed a delinquent act or acts as a juvenile that would constitute a felony if committed by an adult[.]"). The court noted the Defendant's similar conduct against his sisters and K.G.

The trial court refused to find that the victim was particularly vulnerable because of her age because it was considered an element of the offense and the reason the offense was classified as a Class A felony. *See id.* § 40-35-114(4) ("A victim of the offense was particularly vulnerable because of age[.]"). The court also refused to apply factor (7) because "it was a sex case," although the Defendant admitted to the police that his conduct was sexually gratifying. *See id.* § 40-35-114(7) ("The offense involved a victim and was committed to gratify the defendant's desire for pleasure or excitement[.]"). The court found that no mitigating factors applied. Based on the enhancement factors, the trial court sentenced the Defendant to sixty years for each conviction.

Relative to consecutive sentencing, the trial court found that the Defendant had an extensive criminal record and that the offenses were committed while serving another sentence on probation. *See id.* § 40-35-115(b)(2), (6) (2014). The court also found that the Defendant was convicted of two or more offenses involving sexual abuse of a minor who was also his stepdaughter. *See id.* § 40-35-115(b)(5). Based on these factors, the court found that partial consecutive sentencing was appropriate. The court noted, though, that ordering each of the eighteen convictions to be served consecutively to each other went "beyond . . . the lowest level that accomplishe[d] what we need to accomplish under the Sentencing Reform Act." The court ordered consecutive service of Counts 1 and 18. It ordered that Counts 2 through 17 be served concurrently with each other but consecutive to Counts 1 and 18, for an effective 180-year sentence.

The record reflects that the trial court considered the appropriate principles of sentencing and that it imposed within-range sentences for each conviction. *Bise*, 380 S.W.3d at 706-07. The Defendant does not argue that the trial court misapplied any of the enhancement factors or improperly failed to apply mitigating factors. Relative to partial consecutive sentencing, the court considered but rejected the notion that consecutive service of each conviction was warranted. The court noted that ordering full consecutive service of each conviction would violate the principles of our sentencing statutes. The record supports the trial court's finding that the Defendant had an extensive criminal history based on his previous convictions and juvenile adjudication and that the Defendant was on probation at the time of the offenses. Pursuant to Tennessee Code Annotated section 40-35-115(b), a trial court is permitted to impose consecutive sentences if it finds only one criterion. *See State v. Mickens*, 123 S.W.3d 355, 394 (Tenn. Crim. App. 2003). Although the trial court properly found more than one applicable factor, only one criterion was needed to support its ordering partial consecutive sentences. Although the Defendant argues that his effective sentence was excessive and unreasonable, no evidence shows that the trial court abused its discretion. *See Pollard*, 432 S.W.3d at 859. A lengthy effective sentence does not automatically equate to an excessive and unreasonable sentence.

In consideration of the foregoing and the record as a whole, we reverse the judgments of the trial court, vacate the convictions, and dismiss the charges because of insufficient evidence relative to Counts 1 through 17. However, we affirm the judgment of the trial court relative to Count 18.

_____
ROBERT H. MONTGOMERY, JR., JUDGE